Filed 9/5/25  In re Andrew M. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Andrew M., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.M. et al., <br><br> Defendants and Appellants. | G065335 <br><br> (Super. Ct. No. 21DP1437) <br><br> O P I N I O N |

Appeal from orders of the Superior Court of Orange County, June Jee An, Judge. Affirmed.

Marisa L.D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant S.M.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant A.M.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*     \*     \*

In a prior appeal in this dependency matter, we concluded the dependency court had erroneously applied the parental benefit exception (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)).[1] We directed the court to hold a new hearing pursuant to section 366.26 (permanency planning hearing) "forthwith, and, absent an appropriate showing under section 388 that changed circumstances justify different orders, [to] terminate parental rights and order a permanent plan of adoption." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 820 (*Andrew M.*).)

On remand, after conducting a thorough joint permanency planning hearing and hearing on the parents' section 388 petitions, the court ultimately terminated parental rights as to Andrew M. (Andrew). The parents (A.M. and S.M., referred to individually as the mother and the father) offer multiple reasons as to why this was error, including purported denials of due process, error in denial of the section 388 petition, abuse of discretion in the court's ruling that the parental benefit exception did not apply, and error as to the Indian Child Welfare Act (ICWA). We conclude none of these arguments have merit, and therefore, we affirm the juvenile court's orders.

---

[1] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise indicated.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

The history of this case can be found in our prior opinion, *Andrew M., supra,* 102 Cal.App.5th 803 at pages 809–814. The rationale for our reversal is discussed at length in that opinion as well. (*Id.* at pp. 814–820.) Accordingly, our discussion of the facts is limited to the events on remand.

A. *Reopening of the Case*

Our prior opinion ordered the juvenile court to hold a new permanency planning hearing. Accordingly, the court reopened the case and set a review and permanency planning hearing.

At a hearing on August 30, 2024, the mother requested an expert to observe two visits between Andrew, the parents, and his siblings. On September 5, the court granted the request for a bonding study to take place over eight hours of supervised visits, with one visit observed with the parents and one with Andrew's siblings.

B. *September 2024 Interim Report*

In September 2024, Orange County Social Services Agency (SSA) received a declaration from Andrew's visitation monitor. The monitor had been supervising visits since January 2024. In total, there had been nine visits, although the court's order authorized 23 visits. For some visits, the parents had been late, and for others, they had confirmed and canceled shortly before a visit was to start. The parents were also inconsistent in paying for the monitor. The monitor reported that during the "few" visits they had, the parents engaged and interacted with Andrew "in a caring way."

SSA reported that overall, between January and September 2024, the parents visited with Andrew 11 times despite the court order allowing 35 visits. Between March 30 and June 29, they did not visit at all. Again after

July 13, the parents did not visit for another two month period. As of the date of the September 5 interim report, the parents had not visited since July 13.

*C. Permanency Planning Hearing Report and Addenda*

SSA filed its report in December 2024. By this time, Andrew had turned three years old. The parents were authorized for two-hour visits four times a week. Approximately five visits were cancelled because the parents did not provide the social worker with the required 48-hour notice or did not appear on time for the visit. The parents otherwise attended visitation as scheduled. The visits appeared to go well, with the parents actively engaged with the child. They brought snacks and toys and engaged in meaningful activities.

SSA's recommendation in the December report was to terminate parental rights and free Andrew for adoption.

*D. Section 388 Petitions*

On December 18, the mother requested a continuance of the permanency planning hearing, stating she would file a section 388 petition by January 7, 2025. The father also indicated his intent to file a section 388 petition by that date. The court granted the motion to continue the hearing, noting no further continuances would be granted.

The mother's section 388 petition requested the court to either reinstate reunification services or apply the parental benefit exception and order guardianship as Andrew's permanent plan. The father requested legal guardianship as the permanent plan. Both parents referred to the evaluation of psychologist Jay Slosar, who assessed, on behalf of the mother, whether Andrew had a positive emotional attachment and bond to the parents and whether terminating that bond would be detrimental to him. Slosar observed two visits, the first on November 21 and the second on December 30. Slosar

opined that interactions between the parents and Andrew were "reciprocal" and he observed signs of "mirroring," which was important in attachment theory. His evaluation was that Andrew has a substantial positive bond with the parents and his siblings, and that "a separation or disruption of the relationship from his biological parents and siblings would be an adverse childhood experience that would be detrimental to him."

On January 17, 2025, the court found the parents had met the low burden of proof on the section 388 petitions to proceed to an evidentiary hearing. The court decided to hold a joint permanency planning hearing as well as a hearing on the section 388 petitions. On the same day, the court began the combined hearing. Numerous exhibits were received into evidence.

*E. Testimony at Combined Hearing*

We have reviewed the complete testimony given at the combined hearing. In the interests of brevity, we confine our discussion of the testimony to matters relevant to this appeal.

Several social workers testified. Social worker Noemi Maeshiro had been supervising visits three times a week since September 2024. She testified that Andrew told his daycare provider he was "excited to see his mommy and daddy" before visits, and would ask her every day if he was going to see the parents that day. During visits, Andrew was affectionate with the parents, running to greet them, hugging and kissing them and telling them that he loved them. He was also happy and excited when he saw his siblings. The parents were late to visits "more often than not."

When visits were over, sometimes Andrew wanted to stay, but Maeshiro had no trouble redirecting him. He did not cry when visits were over. Maeshiro had not observed any issues when returning to the caregivers'

home after visits. Andrew was generally a happy child who got along well with most people.

Social worker Jennifer Alvarado served as a visitation monitor once a week. Her testimony was generally consistent with Maeshiro's. Andrew was excited during the start of visits with the parents, used affectionate language such as "'I love you,'" and positively engaged with the parents.

The parents were late to numerous visits. At the conclusion of visits, Alvarado had seen Andrew "a little sad," as if "he still wants to keep playing" with the parents and "doesn't want to let go." Nonetheless, Andrew always seemed happy to return to the caregivers' home.

Social worker Jennifer Heidari had been Andrew's case worker since 2022. She did not personally observe visits but had reviewed the notes of those who did. She had not recommended legal guardianship because the caregivers were willing to provide permanency through adoption, which would be the "most permanent plan" for him.

With respect to the bonding study, she testified that Slosar had only observed Andrew twice and she did not think his opinions about the bond between Andrew and the parents outweighed the permanency of adoption. Andrew was adoptable and the caregivers were prepared to adopt him.

Heidari testified that she considered termination of parental rights detrimental if the child's emotional well-being or mental state would suffer as a result. She testified that during periods without visitation, such as between April 4 and June 29, 2024, she did not see any emotional instability in Andrew. She agreed that did not necessarily mean the child would not suffer detriment if a parental bond was severed.

Two of Andrew's half-siblings testified about their enjoyable visits. Andrew was affectionate with them and the parents.

Slosar testified about his bonding study. He had been retained by the public defender's office. He based his report on documents he reviewed and his observations of two two-hour visits, one with the parents and Andrew, and one that included Andrew's maternal half-siblings. He testified that "reciprocity" was important to a child's development. He defined this as "The give-and-take, the exchange, whether the child goes up to the parents and wants things, seeks them out, asks for help, and the way the parents interact verbally, which in this case I pointed out the father's very good at role playing, imaginary play, and games and, you know, facilitating what the child was doing." He also discussed "mirroring, where the parents or the adult mirror back to the child, the emotions, or even hold them close so they can see that aspect. It's very important in development."

Slosar believed there was a positive and significant bond between Andrew and his siblings. He also observed a positive bond between Andrew and the parents. Slosar believed Andrew would benefit from a continued relationship with the parents. He opined termination of the parental bonds would be detrimental to Andrew.

Both parents testified. As relevant to the issues on appeal, the mother spoke about the positive nature of their visits.

The mother also testified that the missed visits in 2024 were due to issues paying the monitor. She did not agree with termination of her parental rights.

The father testified that Andrew was very important to him. He testified consistently with others about the positive nature of their visits. He did not agree with the termination of his rights.

7

*F. Court's Findings*

With respect to the section 388 petitions, the court denied both, finding there were not changed circumstances.

As to the permanency planning hearing, the court read our disposition in *Andrew M.* The disposition directed the court, absent changed circumstances, to "terminate parental rights and order a permanent plan of adoption." The court remarked that absent a change of circumstances, "I don't have a lot of wiggle room." Nonetheless, the court ruled on all three factors relevant to the benefit exception.

The court found regular and consistent visitation and found sufficient evidence to find a substantial positive emotional attachment. But the court continued: "I don't find that that is enough to outweigh the benefits of adoption. Therefore, I am terminating your parental rights today." The court went on to discuss in detail the facts of the case and to apply them to the relevant law: "So the Court notes, as discussed, and as discussed by the Court of Appeal[], Andrew was very, very young. He was detained at birth. He never lived with the parents. Throughout his life, the only interactions with his biological parents were during hour-long visits, almost all of which were monitored and/or supervised.

"Although he shared an affectionate connection with the parents during visits, and sometimes indicated a reluctance to leave—and the Court described it as a tight hug or reaching out from his car seat, there is no evidence that he ever showed distress or was upset from separating from them.

"I do note, obviously, that he is getting older. It's more difficult for the visits to end. It takes longer to get him to the car. There was testimony that he sits on the floorboard and doesn't want to get into his car

8

seat. But, again, there was a note by the Court that a child of this age would enjoy all of the attention and love that he is receiving during these visits. That, to me, would be the catalyst for not wanting these visits to end.

"Outside of the visits, there is no evidence that the parents played a meaningful role in Andrew's life. They did not attend medical appointments I believe, aside from the one that mother testified to, which I believe was over a year ago. They had no understanding of his health circumstances or any of the additional services that he was receiving from the Regional Center, I believe, for speech.

"The circumstances, unfortunately, point to a relative weakness of the relationship, and indicate no meaningful detriment that would flow from terminating parents' rights.

"Regarding the report by Dr. Slosar, specifically Dr. Slosar, I think, wrote and also testified that he observed a positive bond between Andrew and his parents, and Andrew and his half-siblings. In Dr. Slosar's opinion, a separation or disruption of the relationship from his biological parents and siblings would be an adverse child experience that would be detrimental to him.

"The Court was not very persuaded by Dr. Slosar. The Evidence Code does allow the juvenile court to appoint any expert to study the bond between a parent and the child; however, the Court is not required to accept that expert's opinion at face value."

After discussing a recent case about the helpfulness of expert opinion, the court continued: "I combed through Dr. Slosar's report, looking for any specific detail, any specific conclusion of how Andrew would be affected by the Court terminating parental rights, and any detriment he

9

would face. That sentence that I read earlier was the extent of Dr. Slosar's conclusion.

"I don't show any specific facts or opinion by Dr. Slosar on how Andrew, specifically, would be affected by a termination of parental rights and no longer seeing his biological parents."

The court ultimately found by clear and convincing evidence that Andrew was likely to be adopted, and ordered parental rights terminated, and the child placed for adoption. The parents now appeal.

DISCUSSION

I.

DUE PROCESS AND THE SECTION 388 PETITIONS

The parents' first argument is that requiring them to prevail on a section 388 petition "as a condition precedent to proceeding" with consideration of the parental benefit exception deprived them of due process. They contend that prevailing on a section 388 petition "was an impossibility" because the order sought to be changed had previously been vacated by this court. (Boldfacing omitted.)

This argument is somewhat perplexing. It sounds more like a criticism of this court's disposition in *Andrew M.* than taking issue with anything the lower court did. To the extent it is such a criticism, our opinion is long since final, and the parents cannot complain about it now.

To the extent the parents are criticizing how the court implemented our prior disposition, we find no denial of due process, which requires notice and the opportunity to be heard. (*Calvert v. County of Yuba* (2006) 145 Cal.App.4th 613, 631–632.) The parents had both. Indeed, the court bent over backwards to give the parents more time to conduct a bonding

10

study. It found they had met their prima facie burden on the section 388 petitions and granted an evidentiary hearing on their petitions.

The parents complain they could never have prevailed on their section 388 petitions because this court had vacated the prior order, leaving nothing to "change, modify, or set aside." The parents did not raise this issue or take this position below, where the mother agreed that "everyone's opinion here is that we have to file a 388." Further, the court did not deny the section 388 petitions because there was no order to modify. It denied them because of a lack of changed circumstances.

In ruling on the section 388 petitions, the court noted: "I found myself reviewing the records and asking, 'What exactly is the changed circumstance?' Is it the fact that we had an expert opinion by Dr. Jay Slosar? Is it the daily visitation notes from the supervisor? Is it that Andrew is now three, almost four, I believe—excuse me, three years and three months, and that he's older, more verbal? Is it that the parents are sober? [¶] Considering all of the new evidence in front of me, particularly the expert opinion by Dr. Jay Slosar, the Court, unfortunately, cannot find that there is a changed circumstance in this case."

We find the parents had ample due process here, and further, any claim of "impossibility" of prevailing on their section 388 petitions was irrelevant. The court never reached the issue of what modification it might make to a prior order because it found the parents had not established changed circumstances. We find no due process violation occurred.

II.

NO ERROR IN DENIAL OF SECTION 388 PETITIONS

We review the court's decision to grant or deny a section 388 petition for abuse of discretion. "We must uphold the juvenile court's denial of

11

appellant's section 388 petition unless we can determine from the record that its decisions "'exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"" (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

To justify granting a section 388 petition, the petitioning party must show both a genuine change in circumstances and that modifying a prior order would be in the child's best interests. (*In re S.J.* (2008) 167 Cal.App.4th 953, 960.) The party requesting the change in order has the burden of proof to demonstrate both elements by a preponderance of the evidence. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1194 & fn. 4.) After reunification services have been terminated, a child's best interests with respect to a section 388 petition includes the child's need "'for permanency and stability.'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The request for a modification must be viewed in the context of the entire dependency proceeding. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

The mother[2] argues that merely presenting "'new evidence'" triggers the requirement for the court to consider the second prong of section 388, and she contends Slosar's report was "'new evidence.'" But the court rejected the contention that Slosar's report constituted new evidence. The court did not find Slosar's report to be persuasive, and the court further mentioned that Slosar's opinion relied upon the same facts referenced in our prior opinion. There, we noted that "during their visits, the parents would

---

[2] The parents joined in each other's arguments. We agree with the father that his failure to identify the section 388 petition in his notice of appeal does not preclude him from raising it in this appeal.

12

care for Andrew and play with him, and they were loving and affectionate toward him. The parents' testimony supported findings that Andrew called them mommy and daddy, greeted them with excitement, was affectionate with them (particularly with Mother), and sometimes indicated reluctance to leave visits . . . ." (*Andrew M., supra,* 102 Cal.App.5th at p. 816.) Nothing in Slosar's report was substantively "new." He merely relied upon facts previously in evidence to provide what the court found to be an unpersuasive expert opinion.

The father contends that Andrew's increased ability to speak and Slosar's report constituted a change of circumstances. With respect to Slosar's report, we reject this contention for the same reasons we noted as to the mother's argument. As to Andrew's increased ability to speak, in our prior opinion, the "Mother testified that Andrew would run up to her and Father with excitement when he saw them and that he referred to them as "'Mommy'" and "'Daddy.'" According to Mother, during visits, Andrew would grab her face, kiss her, and rub his nose with hers. He was a 'mama's boy' because he always wanted to be with her. Andrew did not cry at the end of visits, but he would hold Mother more tightly, 'like he want[ed] to stay with [her].' . . . [¶] Father testified that at the beginning of visits, Andrew would notice Mother first, run to her, and say "'Mama, mama.'" . . . At the end of visits, Andrew would reach out to him because he wanted Father to take him out of the car seat." (*Andrew M., supra,* 102 Cal.App.5th at p. 812.)

To support a section 388 petition, the change in circumstances must be "substantial," meaning of such a significant nature that setting aside or modifying a prior order is required. (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) A child's normal development typically does not qualify. Andrew's speech demonstrating affection toward his parents may have been more

13

developed than his prior speech, and it was noted by the court, but it was not a significant change of circumstances. The record at both the time of our prior opinion and the combined hearing reflects the same facts. Andrew enjoyed the visits, and he was affectionate with his parents, but was never overly upset or distressed when the visits ended. The parents have not established an abuse of discretion in the court's decision to deny the petitions for modification.

## III.

### NO ERROR IN FINDING THE PARENTAL BENEFIT EXCEPTION DID NOT APPLY

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The purpose of the section 366.26 hearing is to select a permanent plan for the child. (*Id.* at pp. 630–631.) Section 366.26 lists permanent plans in order of preference, and adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Edward R.* (1993) 12 Cal.App.4th 116, 121–122.) The court must first find by clear and convincing evidence that the child is likely to be adopted. (§ 366.26, subd. (c)(1).) If the court does so, and services have already been terminated, the court then terminates parental rights to permit adoption. (*Caden C.*, at pp. 630–631.)

The exception to this rule is if the parent shows that one of several statutory provisions applies. (§ 366.26, subd. (c)(1)(B)(i)–(vi),(c)(4)(A).) "[I]f the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, *supra*, 11 Cal.5th at pp. 630–631.) The parent bears the burden of

14

establishing the exception applies. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418–1419.)

One of these is the parental benefit exception. "From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact,* and (2) a *relationship,* the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra,* 11 Cal.5th at pp. 631–632.) This is a high standard to meet on appeal. The beneficial relationship exception to the termination of parental rights "may be the most unsuccessfully litigated issue in the history of law." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5, disapproved on other grounds by *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414.)

The first two elements of the court's analysis are reviewed for substantial evidence. (*Caden C., supra,* 11 Cal.5th at pp. 639–640.) "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Caden C., supra,* 11 Cal.5th at p. 640; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.) "The [court's] determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C.,* at p. 640.)

The final step, determining whether termination of parental rights would be detrimental to the child is reviewed for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) "Review for abuse of discretion is subtly different [than substantial evidence review], focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""" (*Ibid.*) "[T]he practical difference between the standards is not likely to be very pronounced." (*Ibid.*) "At its core, the hybrid standard . . . simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Ibid.*)

As relevant here, the court found both regular and consistent visitation and a substantial positive emotional attachment. But the parents contend the court erred by finding they had not established the third element, which focuses on "whether 'termination would be detrimental to the child due to' the relationship — the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) In doing so, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at pp. 631–632.) The court decided the relationship with the parent did not outweigh the benefit of adoption.

At the center of this case is a three-year-old child who has been the subject of dependency proceedings since he was born. He has never lived

with the parents or interacted with them outside of supervised visitation. He has been living with the caregivers, who have de facto parent status, since he was released from the hospital after birth. Andrew was generally and specifically adoptable, and the caregivers stood ready to adopt him and provide him with a permanent home. While Andrew enjoyed the visits with the parents and showed them affection, there was no evidence he showed distress upon separating from them or returning home. The court found that Andrew enjoyed the attention he received at the visits, and that was the catalyst for not wanting the visits to end. There was no evidence at all that Andrew was negatively impacted by long breaks in visitation.

The court also found no evidence that the parents played any meaningful role in Andrew's life outside of visits. They did not, with one exception, attend medical appointments. As we noted in our prior opinion, there was no evidence presented that they understood his diagnosis of nystagmus, nearsightedness, and optic nerve atrophy, which required him to wear eyeglasses. (*Andrew M., supra,* 102 Cal.App.5th at p. 819.) The record reflects that nothing on this point had changed since our prior opinion. "The parents' lack of meaningful engagement or familiarity with Andrew's medical condition is not a marker of a strong parent-child relationship." (*Ibid.*)

Indeed, nothing substantial appears to have changed since our prior opinion. As we noted: "[T]he circumstances here do not support a conclusion that the parents' relationship with Andrew was 'so important' as to outweigh the benefits of adoption. [Citation.] In other words, this case cannot be deemed the kind of ""extraordinary case"" in which preservation of parental rights prevails over the Legislature's preference for adoptive placement." (*Andrew M., supra,* 102 Cal.App.5th at p. 820.)

17

We conclude the court did not err by finding the parental benefit exception did not apply.

IV.

THE COURT PROPERLY HELD A NEW PERMANENCY PLANNING HEARING AND FULLY ASSESSED THE APPLICABILITY OF THE PARENTAL BENEFIT EXCEPTION

The parents also argue they had a due process right to a full assessment of whether the parental benefit exception applies. The parents received such an assessment, both in the initial hearing that led to *Andrew M.* and on remand. On remand, the court held a new permanency planning hearing and heard the testimony of 11 witnesses over the course of multiple days. The parents make far too much of the court's "wiggle room" comment, which correctly noted that this court had ordered it to reverse its prior decision absent a change in circumstances. The court nonetheless heard all relevant and admissible evidence the parties wished to present and evaluated the evidence fully on the record, providing the reasons for its decision. The record does not support the mother's assertion that the court substituted our judgment, as reflected in our prior opinion, for the court's own. Again, we find no due process violation.

V.

ICWA NOTICE

The parents contend SSA and the court did not meet its duty of inquiry under ICWA. We conclude this argument is without merit.

*A. Standard of Review and Legal Framework*

"In 1978, Congress enacted the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) to 'formalize[] federal policy relating to the placement of Indian children outside the family home.' [Citation.] Under ICWA's state analogue, the California Indian Child Welfare Act (Cal-ICWA;

18

. . .), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases. (Welf. & Inst. Code, § 224.2, subd. (a).) Child welfare agencies discharge this state law duty by 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.'" (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1124–1125 (*Dezi C.*).) Among other things, ICWA provides for notice of dependency proceedings to a Native American child's tribe and gives the tribe the right to intervene in the case. (25 U.S.C. § 1912, subd. (a); § 224.1.)

"In 2016, new federal regulations were adopted addressing ICWA compliance. [Citation.] The regulations are binding on state courts, are intended to 'improve ICWA implementation,' and clearly identify what actions state courts and agencies must undertake to ensure ICWA implementation in child welfare proceedings." (*Dezi C., supra,* 16 Cal.5th at p. 1130.) As a result of the new federal regulations, "California made conforming amendments to Cal-ICWA, including portions of the Welfare and Institutions Code related to ICWA inquiry and notice requirements." (*Id.* at p. 1131.) These amendments "'revise[d] the specific steps a social worker, probation officer, or court is required to take in making an inquiry of a child's possible status as an Indian child.' [Citation.] As a result of this amendment, "'agencies now have a broader duty of inquiry and a duty of documentation.'"" (*Ibid.*)

"Section 224.2 codifies and expands on ICWA's duty of inquiry to determine whether a child is an Indian child. Agencies and juvenile courts have 'an affirmative and continuing duty' in every dependency proceeding to

19

determine whether ICWA applies by inquiring whether a child is or may be an Indian child. (§ 224.2, subd. (a).) This 'duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child.'" (*Dezi C., supra,* 16 Cal.5th at pp. 1131-1132, fn. omitted.) "Section 224.2, subdivision (b) specifies that once a child is placed into the temporary custody of a county welfare department, the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.'" (*Id.* at p. 1132.) "When the agency has 'reason to believe' that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required." (*Ibid.*)

We review the juvenile court's findings regarding ICWA under the substantial evidence standard. "[W]here the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.)

B. *SSA and the Court Met Their Respective ICWA Obligations*

The record reflects that SSA asked numerous family members about potential Native American heritage. In December 2021, both parents denied Native American ancestry and completed ICWA-20 forms reflecting this. The parents repeatedly denied any Native American heritage when asked in 2022 and 2024.

The parents were ordered by the court to provide family contact information for ICWA purposes on five occasions in 2023.

20

The maternal aunt denied any Native American heritage twice, in July 2022 and March 2023. The maternal uncle denied having any Native American heritage in June 2023.

As to paternal relatives, the paternal grandmother told SSA her family is Hispanic and has no Native American ancestry. The father advised the social worker that the paternal grandfather had passed away. The paternal uncle denied any Native American ancestry in June 2023. In August 2023, all five of father's siblings denied any Native American ancestry.

The mother criticizes SSA for not inquiring of the maternal great-grandmother and maternal grandfather. The court specifically inquired about the maternal grandfather in November 2023. The mother confirmed that he was deceased. There is nothing in the record to suggest that the maternal grandfather was reasonably available for inquiries while he was alive. (*Dezi C., supra,* 16 Cal.5th at p. 1140.)

As to the maternal great-grandmother, she was mentioned by the maternal grandmother, Victoria H., as possibly having Native American ancestry during SSA's inquiries. The record reflects that SSA made an effort to obtain contact information for the maternal great-grandmother from Victoria H. Victoria H. refused to provide contact information because "she does not want the maternal great-grandmother to know about this case." When SSA asked Victoria H. about ancestry on a later date, she indicated "'No American Indian that I know of.'" There was no claim of Native American ancestry that would have allowed SSA to seek assistance from the Bureau of Indian Affairs, despite the mother's claim to the contrary. (*In re J.S.* (2021) 62 Cal.App.5th 678, 689–690 ["Without the identity of a tribe, let alone a federally recognized one, or at least a specific geographic area of possible ancestry origin, the Bureau of Indian Affairs (BIA) could not have

21

assisted the Department in identifying the tribal agent for any relevant federally recognized tribes"].)

Further, the mother had been ordered by the court to provide contact information for relatives for ICWA purposes, but no contact information for the maternal great-grandmother was provided to SSA. The record does not reflect that SSA even had the maternal great-grandmother's full name.

SSA is not required to conduct an extensive independent investigation for leads as to Native American ancestry. (*In re Levi U.* (2000) 78 Cal.App.4th 191, 198–199.) CAL-ICWA "'does not require the agency to "find" unknown relatives and others who have an interest in the child, merely to make reasonable inquiries. The operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked.'" (*Dezi C., supra,* 16 Cal.5th at p. 1140.) There is no evidence the maternal great-grandmother was ""'reasonably available'"" to SSA.

We conclude that SSA conducted a sufficient inquiry in this case. SSA acted on the information it had available to it, based on the family members who were available for inquiry. The court appropriately inquired and made orders.

The mother also claims that because we vacated the prior permanency planning orders, the record was "silent" as to the applicability of ICWA. We agree with SSA that the court previously made a finding that ICWA did not apply in at the prior permanency planning hearing, that nothing had changed, and therefore an implied finding that ICWA did not apply is appropriate. (See *In re Asia L.* (2003) 107 Cal.App.4th 498, 506.) There would be no point in remanding this matter for the sole purpose of

22

adding an already evident ICWA finding to the record, and we do not find that delaying Andrew's adoption by even one more day is in his best interest. We find no error.

## DISPOSITION

The juvenile court's orders are affirmed.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


GOODING, J.